[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The court has before it a number of postjudgment motions for modification of a judgment which was entered by agreement of the parties on January 6, 1998. The judgment file indicates that after finding the necessary elements of jurisdiction the court made a finding that the marriage had broken down irretrievably, dissolved the marriage and ordered that the plaintiff and the defendant share joint legal custody of the minor children. The court made a further order that visitation would continue until such further order of the court as per a handwritten agreement between the parties dated January 13, 1996, and as on file designated Item 111 in the court file. This agreement reads as follows:
"Visitation Schedule shall be as follows on a rotating four-week schedule until school begins:
Week One — Monday, Wednesday, Friday, Saturday, Sunday with Plaintiff and Tuesday, Thursday with Defendant.
Week Two — Wednesday, Thursday, Sunday with Plaintiff and Monday, Tuesday, Friday, Saturday with Defendant.
Week Three — Monday, Wednesday, Friday, Saturday, Sunday with Plaintiff and Tuesday, Thursday with Defendant.
Week Four — Monday, Tuesday, Friday, Saturday with Defendant and Wednesday, Thursday, Sunday with Plaintiff. CT Page 10621
Weekday overnights begin at 5:00 p. m. and end at 7:00 a.m. the next morning.
Sundays when the Defendant has the Children and the Children are not spending the night with the Defendant, Defendant shall bring Children to the Plaintiff at 5:00 p. m.
Said arrangement for visitation shall remain in effect until further orders of the Court."
The agreement also provided that this visitation shall remain in effect until further orders of the court. As noted, the agreement was entered into at a time when school was on vacation and specifically indicated or contemplated some type of a different agreement when school began. At the time of this agreement, the parties were not living in the family dwelling house at 345 Thorpe Avenue, Meriden, Connecticut. The plaintiff had left the dwelling and was apparently residing with the children at her father's house.
The agreement Item 111 was silent as to the physical custody of the children or the principal place of residence of the children; the judgment does not contain a specific order with regard to these elements. Defendant now contends that the agreement provided for joint physical as well as joint legal custody. Plaintiff disputes this.
The agreement also provided that the matter was referred to the family relations for a mediation with a study to follow if the family relations office deemed it appropriate to determine the issue of physical custody and a permanent visitation-parenting access schedule.
A review of the file indicates that the initial complaint of the plaintiff sought legal custody with the principal residence with the plaintiff. Shortly thereafter, the defendant filed a cross complaint seeking joint custody of the minor children. On July 23, 1996, by Motion No. 116, the plaintiff sought leave to file an amended complaint to seek sole custody, both legal and physical. By way of Motion No. 119, dated July 29, 1996, the defendant sought to amend his cross complaint to seek sole custody both legal and physical. These motions were not ruled upon by the court prior to the dissolution proceeding. CT Page 10622
On or about October 7, 1996, the defendant filed a motion for contempt accusing the plaintiff of refusing to abide by the visitation schedule. At the same time, the defendant moved to modify custody to give him primary physical custody. In October of 1996, the parties reconciled for a short period of time.
The reconciliation failed, and on October 31, 1996, the defendant filed an amended motion seeking to modify custody alleging that the agreement of June 13, 1996, provided for joint legal and physical custody and asserted again that the plaintiff was denying him access to the children. This motion did not come before the court for a ruling prior to the dissolution in January of 1998.
In June of 1997, the defendant filed a second request for a leave to amend the cross complaint, Item No. 147 in the file. This request sought sole legal and physical custody of the children, and in the alternative, joint legal and joint physical custody of the children.
It is apparent from this review of the file that although the court order of June 13, 1996, was based upon the agreement of the parties and has remained in place without modification until the time of judgment on January 6, 1998, neither party was satisfied with these arrangements. At the hearing before Judge Levine, in January of 1998, the parties came to another agreement. This agreement was the basis for the dissolution and provided orders for unallocated alimony and support, health insurance for the children, life insurance for the children, a transfer of the jointly owned property known as 345 Thorpe Avenue, Meriden, Connecticut, to the defendant in consideration of a payment of $8,750.00 to the plaintiff. The court also entered an order for a lump payment to the plaintiff and made a distribution of the defendant's 401(k) and profit sharing plan to the plaintiff. The final orders of the court also concerned personal property, tax-exemptions, automobiles and a specific order with regard to a nail compressor and gun which was used by the plaintiff for cosmetic purposes in conjunction with the beauty work which she conducted in her home. The court determined that this nail compressor and gun was either in the possession of the defendant or had been in his possession at the time that it was lost. The court gave the defendant the option to either replace the nail compressor and gun or to pay the plaintiff the sum of $500. At the request of the parties, the judge permitted them to go forward with a divorce and property settlement and refer the CT Page 10623 matter of visitation and physical custody to a judge trial referee.
Immediately after the January 6, 1998 dissolution hearing, the plaintiff filed a motion for modification of custody and support in accordance with Judge Levine's order that this matter be referred to a judge trial referee. Shortly thereafter, on January 20, the parties agreed that an attorney should be appointed for the minor children, and the court appointed Attorney Laura Zullo to serve in this capacity.
The court held hearings on these motions on July 13, 1998, and July 14, 1998.
Both parties testified at length, and each introduced witnesses to support their position. The plaintiff's basic complaint was that the current midweek overnight visitation order exacerbates her difficulties in communicating with her former husband, interferes with her custodial schedule, frustrates normal day-to-day family life during the school year and presents her with considerable difficulties in getting her eldest son to school on a timely basis, presents her with difficulty in getting the children to school as a result of the weekly overnight visitation which the defendant enjoys during the school year. The plaintiff also testified that she found it extremely difficult to communicate with her former husband over the visitation schedule and has stopped trying to communicate with him directly, instead using one of the children as a medium of communication. Plaintiff attributes this lack of communication between the parties to the husband's vulgarity and rudeness. The plaintiff offered testimony to corroborate the defendant's use of vulgar language directed toward her in the presence of the children. In addition several neighbors testified to the impatience demonstrated by the defendant when the children were not immediately ready for him when his visitation was scheduled. These neighbors testified that the defendant would demonstrate this impatience by leaning on the horn of his automobile.
Despite these complaints about her former husband, plaintiff admitted that the defendant was a loving, caring father and was a suitable person to have liberal visitation with the children and that it was the best interests of the children to have liberal visitation with the father.
Defendant indicated although his former wife would not CT Page 10624 communicate with him that she had been a good mother while they were living together and that she was a suitable person to have the care of the children. Considering all the evidence that the court heard, the court is able to find that the children are benefitting [benefiting] from the care of both parents, and those children who are in school are progressing reasonably well.
Defendant offered into evidence Exhibit No. 4, a custody evaluation report from the judicial branch, family division, prepared by Mr. Andrew Castle and completed on June 19, 1997, some six months before the dissolution. This report stated that since the marital separation in April of 1996, the parents have shared joint custody with the children living with both parents according to an agreed upon schedule. The father cares for the children on alternating weekends from Friday to 5:30 P.M. to Sunday at 5 P.M. In addition, the father cares for the children overnight on Monday and Tuesday preceding his weekend with the children and overnight on Tuesday and Thursday when he does not have a weekend with the children.
The June 19, 1997 report from Family Relations noted that a breakdown in communications between the parents had contributed to their inappropriate behavior at times in front of the children, and in some instances, physical altercations had occurred between the parties. The report noted that the police were called on two occasions resulting in the arrest of Mr. Uvino and that Mrs. Uvino was arrested once. In the report Mrs. Uvino stated strongly that she should have physical custody of the children, and the father should not have overnight visitation during the school week although she indicated that the children were doing well under this schedule. Mr. Uvino told the family relations investigator that he believed that they should share joint physical custody and that the current parenting schedule was appropriate.
Both parties have been in therapy, sometimes individually and also on a few occasions, jointly with Thomas Thurber, LCSW. Thurber's report indicates that both individuals had difficulty communicating with each other. The family relations report indicated that contact had been made with school authorities, where Dominic, the seven-year-old child, attended. This contact indicated that Mrs. Uvino initiated counseling for Dominic, and the school counselor sees him on a regular basis. Mrs. Steadman, the school counselor, reported that Dominic is capable of learning at grade level material but that he has been impacted by CT Page 10625 his parents' difficulties and is confused by his parents' negative behavior.
The family relations report indicated that four-year-old Lauren has attended the First Congregational Nursery School for two years, and it is anticipated that she will enter the first grade or kindergarten in September of 1998. The teacher at the nursery school reported to family relations that Lauren is pleasant and social and enjoys being with other children, and her behavior is good.
The third child, two-year-old Nicole, is cared for by her mother during the school week on a daily basis. The children appear very happy to be in both homes according to the family relations report. The report described them as active and friendly and both parents interacting well with them.
The children's pediatrician, Steve Frank, M.D., reported that the children appeared to be healthy and well cared for. He stated that his contact had generally been with the mother.
Mrs. Uvino has been primarily a full-time homemaker and mother during the marriage; she does manage a part-time beauty care business in her home but has remained focused more on the children. Since the dissolution, the mother, Mrs. Uvino, has engaged in some temporary employment in the state vocational high school system as a beauty counselor.
The family relations counselor, Mr. Castle, stated that she appeared to be a very good and devoted mother with many concerns about the children. The family relations report determined that Mr. Uvino had been working in a management position for thirteen years, and he also appeared to be a good and dedicated parent. The report noted that he cares well for the children and seems to have an excellent relationship with them.
The family relations report concluded that the parents were unable to resolve their interpersonal issues relative to the marriage, and that it would be beneficial for Mr. and Mrs. Uvino to continue in postdivorce counseling together so that they may learn communication skills that would help them to productively discuss their children. Mrs. Uvino has been reluctant to participate in joint counseling with her former husband. The family relations report concluded that joint custody was appropriate for this family as the parents have great potential CT Page 10626 for working together to raise the children. The report stated that it was apparent that the children have a close relationship with their father and need to have regular contact with him and that the current schedule provides this. The report did note that it is very possible that overnight contact with the father during the school week will have to change as the children grow older if the schedule creates stress and conflict for them. The report stated that at this time the children do not appear to be negatively impacted by the arrangement, and there was no justification for reducing the father's time with the children and indicated that the current parenting schedule should therefore continue. The family relations recommended in its July 19, 1997 report that the parents share joint legal custody of the children with physical custody awarded to the mother and that the current parenting schedule should continue.
An update custody report from Mr. Castle was completed on or about December 19, 1997, just prior to the dissolution hearing in January of 1998. This report was introduced in evidence by the defendant as Exhibit 3. In this report, Mrs. Uvino again indicated that the children should not be staying with their father overnight during the school week. She felt that the seven-year-old, Dominic, was unable to complete his homework with his father at those times. She also felt that the schedule is disruptive for all the children. Mr. Uvino indicated that Dominic was doing very well, and his schedule with the children is most appropriate. Mr. Castle made a further contact with Dominic's school counselor, Betty Steadman. Mrs. Steadman indicated that Dominic is doing well in school and has improved academically in the school year. Mrs. Steadman has not had any contact with Mrs. Uvino during the 1997-98 school year. She has had some recent contact with Mr. Uvino who indicates he has concerns about not having access to Dominic's homework.
Family services concluded that the original custody recommendation is appropriate. In addition, supportive counseling is recommended for Dominic. If Dominic is experiencing problems related to overnight visits during the week, counseling can address this issue, and changes in the current schedule can be made.
Laura Zullo, the children's attorney, participated in the hearing and advised the court that she felt that the present visitation was in the best interests of the children and should be continued. CT Page 10627
The plaintiff has proposed a visitation schedule which would provide the father during the school year with alternate weekends commencing Friday after school until Sunday night at 7:30 P.M. During the school year, the father would have two afternoon visits during the week from 3 o'clock until 7:30 P.M. with the requirement that the father feed the children and bring them home promptly at 7:30 P.M. The plaintiff proposed that holidays be divided equally between the parents with the father to have Father's Day; the mother to have Mother's Day; in addition each parent to have their respective birthdays; the children's birthdays to be divided equally. In the summer, each parent would be entitled to two weeks' uninterrupted vacation with the minor children with the parent giving the other parent at least sixty days' notification before July 1.
The plaintiff asked the court to give weight to the fact that the defendant refuses to communicate with her, particularly, at pickup and drop-off times; that the defendant has used vile language and insulted her in the presence of the children and has acted inappropriately when the children are late for scheduled visitation. She also complained that the defendant resents having the children scheduled for church functions, recreation functions and other items whenever it infringes upon his scheduled visitation time; that he frequently brings the child Dominic home late so that the mother will have to quickly put him in a car and drive him to school in order to arrive at school on time. Plaintiff also asks the court to minimize the recommendations of the Family Relations Division inasmuch as Mr. Castle assumed that the parties would learn and adapt to the visitation schedule and that things would improve as a result of that. Plaintiff notes that things did not get better; in fact, they got worse. At least, they got worse from the plaintiff's point of view.
The defendant submitted evidence which indicates that both parents have a good relationship with the children; neither parent nor family relations claim otherwise. The defendant notes that both parties testified that at times the mother has refused to let the children go with their father during his scheduled times because she has made other plans for them. The defendant pointed out that for the mother to do this is a violation of the court order and interferes with the children's relationship with him.
As noted earlier, the decree of the court on January 6, 1998, CT Page 10628 ordered that the plaintiff and the defendant shall share joint legal custody of the three minor children born of this union. Joint legal custody is defined in § 46b-56a of the General Statutes.
 Subsection a: for the purpose of this section "joint custody" means an order awarding legal custody of the minor children to both parents, providing for joint decision making by the parents and providing that physical custody shall be shared by the parents in such a way as to assure the child of continuing contact with both parents. The court may award joint legal custody without awarding joint physical custody where the parents have agreed to merely joint legal custody.
Prior to the hearing, both parties submitted proposed written orders to the court regarding custody and visitation of the children. Plaintiff asked for joint legal custody with the plaintiff as primary physical custodian plus a modification of the existing pendente lite visitation schedule. Defendant proposed that the parties be awarded joint legal and joint physical custody with a slight modification of the existing pendente lite visitation schedule.
Subsequent to the hearing the parties submitted memoranda confirming their proposals.
Since joint legal custody has already been decided in this case, and the evidence submitted at the hearing would not support a finding of either a material change of circumstances or a finding that the original joint legal custody order was not based on the best interests of the children, there is no need for the court to consider any change in the legal custody of the child.Hall v. Hall, 186 Conn. 118 (1982).
The visitation contemplated by § 46b-56a(a) is visitation and physical custody sufficient to assure the children with continuing contact with both parents. (There is no specific requirement [in the statute as to the percentage of the child's time to be spent with either parent nor is there any definition or limitation on the method to be used to assure continuing contact with both parents. Family Law Practice, Rutkin, Effron, Hogan, Sec. 41.8.
When the parties separated in late May of 1996, the mother CT Page 10629 removed herself and the children from the family dwelling residing initially at her mother's home, then moving to her brother's house, and finally, coming to rest at 242 Carriage Drive, Meriden, Connecticut, where she apparently has resided for the past eighteen months. This is a single-family home owned by a single, divorced gentleman who resides on the premises. The exact relationship between the plaintiff and this gentleman was not developed through testimony at trial. Plaintiff did call the parents of this gentleman to testify on her behalf. Katherine Zygmont, the mother, lives approximately six blocks from 242 Carriage Drive and occasionally babysits for the plaintiff. She testified that the defendant father sits on his horn when the children are not ready on time for his visitation and that often the children were reluctant to go with their father. Francis Zygmont, the father, testified that the girls were often reluctant to accompany their father, but Dominic goes freely. He also testifies that on occasion he has helped Dominic with his homework. He confirmed his wife's testimony that the defendant sits on his horn when the children are late for their pickup by the father. Defendant disputes these contentions and says that in the main when the children come to him, they settle down after a few hours and enjoy visitation with him. He stated that he enjoys cooking for them and cleaning for them, and he is looking forward to continuing contact with the children and has even suggested further contact with them.
The present visitation schedule was agreed upon when the plaintiff's living conditions were not finalized and when school was not in session. At the time Dominic was six and one-half years old and had just finished first grade. These conditions were probably factors influencing plaintiff to agree to the pendente lite order. Although plaintiff objected to the order almost immediately, specifically to the midweek overnight visitation during his school year, her objections were not heard by a judge, and the visitation schedule has remained in place during the 1996-97 and 1997-98 school year.
At the present time the father resides in the former family home which is not distant from Carriage Drive where the children reside. His home is in Dominic's school district. The father has offered to take Dominic and presumably Lauren directly to school after midweek overnight visitation, but this is not agreeable to the mother. Both parties are stubborn and inflexible in their positions and seem to have benefitted [benefited] little from counseling or successful participation and completion of the parenting CT Page 10630 education program provided for by Public Act 93-319. Further joint counseling would undoubtedly help the parties understand the realities of joint legal custody and the difficulties inherent in the present visitation schedule.
 "It is well settled in this state that, in deciding custody or visitation issues, a court must always be guided by what is in the best interests of the child. See Schult v. Schult, 241 Conn. 767, 777, 699 A.2d 134 (1997); Knock v. Knock, 224 Conn. 776, 789, 621 A.2d 267 (1993); Yontef v. Yontef, 185 Conn. 275, 282, 440 A.2d 899 (1981). General Statutes § 46b-56(b) provides in part that `[i]n making or modifying any order with respect to custody or visitation, the court shall (1) be guided by the best interests of the child. . . .' Moreover, `[t]his court has consistently held in matters involving child custody, and, by implication, visitation rights, that while the rights, wishes and desires of the parents must be considered it is nevertheless the ultimate welfare of the child which must control the decision of the court.' (Internal quotation marks omitted.) Ridgeway v. Ridgeway, 180 Conn. 533, 541, 429 A.2d 801 (1980); see also Gallo v. Gallo, 184 Conn. 36, 43, 440 A.2d 782 (1981) (in matters regarding visitation orders, `the court considers the rights and wishes of the parents . . . but . . . must ultimately be controlled by the welfare of the particular child')."
Ireland v. Ireland, 246 Conn. 413, 419 (1998).
Despite the problems existing between these former spouses, the children have clearly bonded to each of them. The children's development, socially, physically and psychologically, has been unimpaired to date by the poor communication between the parents. Although no substantial credible evidence was offered at the hearing to suggest that the present visitation schedule affects at this time the best interests of the children, this is not the case as between the parents. The mother who has been and the court finds is at the present time the primary caretaker of the children and the head of the household where the children maintain their principal residence has found that the present schedule exacerbates her relationship with her former husband. Midweek overnight visitation interferes with her normal schedule of activities for the children and often results in a crisis situation developing when the father comes to pick up the children or when the father returns the children later than is CT Page 10631 required by the order. The father and the mother live in the same community, attend the same church, live within a short distance of each other in the same school district where the children attend school. There has been no interference with the father's desire to be informed about the children's physical health or their progress in the school. The court finds from the evidence submitted at the hearing that the mother has no improper motive in making this motion for a change in the visitation schedule during the school year. Eliminating midweek overnight visitation will not defeat the regular contact which the father desires to maintain with his family.
 "(1998) Although the noncustodial parent's interest certainly retains great importance, the parents' interest becomes so intricately interwoven with the well-being of the new family unit that the determination of the child's best interest requires that the interests of the custodial parent be taken into account. "
Ireland v. Ireland, 246 Conn. 413, 422 (1998).
The evidence does not suggest to the court that the loss of midweek overnight visitation during the school year will be devastating to the relationship between the noncustodial parent and the children. Furthermore, the visitation schedule can be adjusted and will be adjusted to provide for midweek visitation to the noncustodial parent although this visitation will be limited and will not extend to overnight visitation during the school year. In addition the court will adopt some of the recommendations of the father with regard to holiday visitation, summer vacation and will permit the parties to return to court for a hearing on overnight visitation during the school vacations during the school year.
In sum, the court concludes that the plaintiff has sustained her burden of proof that the elimination of midweek overnight visitation during the school year will have little or no impact on the quantity and quality of the children's present or future relationship with the noncustodial parent. The new schedule of visitation should diminish the hostility between the custodian and noncustodial parents and may very well improve the relationships of this extended family in the future.
Accordingly, the court will deny the defendant's proposed CT Page 10632 order that the parties be awarded joint physical custody of the children and grant the plaintiff's proposed order granting primary physical custody of the children to the plaintiff and establishing as their principal place of residence the mother's residence. The court grants defendant's motion calling for release of the lis pendens on defendant's property. Defendant's motion for vacation visitation in the summer of 1998 is granted. The court orders the following school year visitation schedule:
 Visitation Schedule
During the school year the father shall have alternate weekends commencing Friday after school until Sunday night at 7:30 p. m. During the school year the father shall have two afternoon visitations during the week from 3:05 p. m. until 7:30 p. m.
 The Court Orders the Following Holiday Schedule:
1. Thanksgiving: pick up time of 9:00 a.m. and drop off time of 3:00 p. m. Even numbered years to Mother, odd numbered years to Father.
2. Christmas: pick up time at 5:30 p. m. on Christmas Eve and drop off time will be the following day (Christmas Day) at 3:30 p. m. Even numbered years to Father, odd numbered years to Mother.
3. New Years: pick up time at 5:30 p. m. on New Years Eve and drop off time will be the following day (New Years Day) at 3:00 p. m. Even numbered years to Father, odd numbered years to Mother.
4. Easter: pickup time at 5:30 p. m. on Easter Eve and drop off time will be the following day (Easter) at 3:00 p. m. Even numbered years to Father, odd numbered years to Mother.
5. Mothers Day and Fathers Day: Regardless of the visitation schedule, the children will spend Mothers Day with their Mother and Fathers Day with their Father. Should the referenced day fall on the opposite parents' regularly scheduled visitation arrangement, the parent of the said holiday will pick up the children up at 9:00 a.m. and return them at 8:30 p. m.
6. July 4th: pick up time will be at 3:00 p. m. on July 4th and drop off time will be the following day at 10:00 a.m. Odd numbered years to Father, even numbered years to Mother. CT Page 10633
7. Memorial Day: pick up time will be at 9:00 a.m. and drop off time will be 3:00 p. m. the same day. Odd numbered years to Father, even numbered years to Mother.
8. Field and Activity Days: The parents shall alternate chaperoning the children on field and activity days. Odd numbered years to Father, even numbered years to Mother.
The Court Orders the Following Summer Visitation Proposal:
Each parent shall have a full uninterrupted two weeks with the children. These weeks can be split as each parent may request. Each parent must notify the other about their final respective schedules no later than May 1st of each year by certified mail. Any requests for changes after May 1st must be by certified mail at least 30 days in advance. All vacation schedules shall include an address and working phone number where the children can be reached. The remaining time with the summer vacation shall be divided equally between the custodial and noncustodial parents.
 Order Re Air Compressor
The plaintiff shall return to the defendant the compressor which he previously bought, and the defendant shall pay to the plaintiff the sum of $400 so that she can acquire her own compressor.
 Orders re Uninsured Orthodontia
The parties shall use an orthodontist and dentist covered by both of the defendant's insurance coverages: Connecticare and Signature Dental Insurance, and divide the uninsured and unreimbursed costs equally.
Said arrangement for visitation shall remain in effect until further orders of the court.
Dorsey, J. Judge Trial Referee